IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HOWARD INDUSTRIES, INC.,

    Plaintiff,                                      10cv0104

                                                  **ELECTRONICALLY FILED**

    v.

ALLEGHENY LUDLUM CORPORATION
*doing business as* ATI ALLEGHENY
LUDLUM,

    Defendant.

## MEMORANDUM OPINION

This declaratory judgment action arises from a contract dispute for the sale of goods between plaintiff, Howard Industries, Inc., and defendant, Allegheny Ludlum Corporation doing business as ATI Allegheny Ludlum. This matter is governed by the Uniform Commercial Code, and this Court has jurisdiction pursuant to 28 U.S.C. ¶ 1332.

Plaintiff filed this lawsuit essentially seeking a declaration that it was entitled to, and properly did, cancel its contract with defendant effective July 29, 2010, including any obligations thereunder.

The parties filed cross-Motions for Summary Judgment (doc. nos. 34 and 41) and they subsequently filed responses to one another's motions. Each party argued that as a matter of law the contract at issue either did or did not support the plaintiff's legal position that it was entitled to the declarations concerning contract cancellation. Thus, the matter is now ripe for adjudication.

## I.     BACKGROUND

The following relevant and material facts are uncontested.

Plaintiff produces electrical transmission and distribution equipment, including transformers which are used by utility companies in North America. Defendant produces specialty metals including grain oriented electrical steel ("GOES"). Plaintiff uses GOES in the core of its transformers. Plaintiff and defendant enjoyed a longstanding business relationship which extended for the past several decades where plaintiff would buy GOES from defendant. See doc. no. 54, ¶¶ 1-5.

Morris Caver, Jr. worked for the plaintiff as its Vice President of Purchasing for the Transformer Division, and starting in year 2005, he negotiated contracts with Raymond Polinski, defendant's General Manager of GOES. In late 2005, plaintiff and defendant negotiated and entered into an agreement for the supply of GOES beginning January 1, 2006 through December 31, 2007 (the "2006 Supply Agreement"). The 2006 Supply Agreement contained a "take-or-pay" provision, which was a deviation from the parties' prior agreements. In addition to the take-or-pay provision, the 2006 Sales Agreement also indicated that all sales would continue to be subject to the defendant's standard terms and conditions ("Terms and Conditions"). *Id.* at ¶¶ 8, 10, 13-15, 17-19.

Paragraph 7 of the 2006 Supply Agreement states in pertinent part:

7.   Terms and Conditions – ALC [Defendant] sales will continue to be subject to the Standard Terms and Conditions set forth on the reverse side of our Sales Order Acknowledgements, except that ALC and HI [plaintiff] specifically agree that:

- No changes of any kind or type may be made to this Agreement except in writing and signed by ALC and HI.

*Id.* at ¶27. See also doc. no. 47-5, Exhibit F (filed under seal).

While the parties were buying and selling GOES pursuant to the 2006 Supply Agreement, in July of 2006, they entered into the "2008 Supply Agreement" which covered the time period from January 1, 2008 to December 31, 2009. The 2008 Supply Agreement contained the identical reference to Terms and Conditions found in the 2006 Supply Agreement (as set forth immediately above), albeit at a different paragraph number. Doc. no. 54, ¶¶ 28-29. See also doc. no. 47-7, Exhibit H (filed under seal).

In late 2007 and early 2008, plaintiff and defendant renegotiated the 2008 Supply Agreement to increase the supply of GOES for 2009 and to extend the term of the 2008 Supply Agreement. In March of 2008, the parties executed this document creating a new supply agreement (hereinafter "2009 Supply Agreement"), which was effective beginning January 1, 2009 through December 31, 2012. Like its predecessors, it too contained the identical reference to the Terms and Conditions (as set forth immediately above), this time, again at Paragraph 7. Doc. no. 54, ¶¶ 32-33, 36. See also, doc. no. 47-8, Exhibit I (filed under seal).

It is the 2009 Supply Agreement that lies at the heart of this lawsuit and the pending Motions for Summary Judgment.

Like its predecessors, the 2009 Supply Agreement indicated that defendant would supply, and plaintiff would purchase, a specified volume of GOES on a "take or pay" basis. The 2009 Supply Agreement also specified the amount of GOES to be supplied by defendant and purchased by plaintiff on a weekly basis for each of the four years (2009, 2010, 2011, and 2012). The 2009 Supply Agreement indicated that the "base pricing" for GOES for 2011 and 2012 would be agreed upon by the parties at a later date (*i.e.* by no later than April 30, 2010 for the 2011 shipments, and no later than April 30, 2011 for the 2012 shipments). This Supply

Agreement was executed by a duly authorized representative from each company. Doc. no. 54, ¶¶ 34-35, 37-40.

In late 2008, the housing market and national economy began to decline. Because the transformer market is closely tied to the new housing market, plaintiff's business and its need for GOES similarly declined. Plaintiff contends and defendant does not deny, that plaintiff's business began to decline in latter half of 2008, continued to decline through 2009, and has been at its lowest point thus far in 2010. *Id*. at ¶¶ 63-64.

Presumably as a result of its declining business, shortly after the term of the Supply Agreement commenced (January 1, 2009), plaintiff asked defendant for relief from the GOES tonnage required under the Supply Agreement. Defendant agreed to allow plaintiff to temporarily defer purchases of certain grades of GOES between February 2009 and the summer of 2009. Plaintiff contends, and defendant does not deny, that by late June of 2009, plaintiff was stockpiling large quantities of GOES. *Id*. at ¶¶ 65-68.

In late June of 2009, plaintiff asked defendant to cancel a portion of the 2010 tonnage requirements under the Supply Agreement. Defendant agreed to consider larger deferrals, but would not consider any cancellations of any specific quantities of GOES. Plaintiff threatened to cancel the Supply Agreement under paragraph 11(b) of the Terms and Conditions if defendant could not come to an agreement with plaintiff and provide plaintiff with the relief it sought. *Id*. at ¶¶ 66-69.

Paragraph 11(b) of the Terms and Conditions provides:

This Agreement is noncancellable by Buyer [plaintiff] for all goods and/or services for which the estimated dates for shipping and/or rendering services shown on the face hereof are within two (2) years from the date of acceptance of this Agreement by Buyer provided, however, that goods and/or services estimated to be shipped or performed from and after two (2) years from the date hereof may be cancelled without cancellation or other penalty in whole or in part by Buyer

4

> upon one (1) years prior written notice to Seller [defendant] with respect to the specified goods and/or services covered by this Agreement which are to be so cancelled.

*Id*. at ¶ 71.  See also doc. no. 47-17, Exhibit R (filed under seal) and doc. no 18, Exhibit B to Complaint (filed under seal).

On July 29, 2009, plaintiff sent defendant a letter attempting to cancel the Supply Agreement effective twelve months later; *i.e.,* by July 29, 2010.  Plaintiff contends this letter constitutes an effective cancellation of the Supply Agreement as of July 29, 2010, while defendant disputes that this letter is an effective cancellation.  Doc. no. 54 at ¶¶ 73-74.  See also doc. no. 47-18, Exhibit S (filed under seal).

## II. LEGAL STANDARD

The Federal Rules provide that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  A dispute over those facts that might affect the outcome of the suit under the governing substantive law, *i.e.* the material facts, however, will preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Similarly, summary judgment is improper so long as the dispute over the material facts is genuine.  *Id*.  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Id*. at 248-49.

The standards by which a court decides a summary judgment motion do not change when the parties file cross-motions. See *Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n* 826 F.Supp. 1506, 1512 (E.D. Pa. 1993). That is, when ruling on cross-motions for summary judgment, the court must consider the motions independently. See *Williams v. Philadelphia Hous. Auth.*, 834 F.Supp. 794, 797 (E.D. Pa. 1993). The mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a jury. *Facenda v. N.F.L. Films, Inc*. 542 F.3d 1007, 1023 (3d Cir. 2008), citing, *Rains v. Cascade Industries, Inc*., 402 F.2d 241, 245 (3d Cir. 1968) (Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist).

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the evidence is so one sided that the movant must prevail as a matter of law. It is on this standard that the Court has reviewed each party's motion as well as their respective responses and replies thereto.

With regard to the applicable law, a federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

### III. DISCUSSION

The legal issue presented by each party is whether plaintiff may cancel the 2009 Supply Agreement. Because there are no underlying disputes of material fact, this issue can be decided on the parties' cross-Motions for Summary Judgment. As previously noted, because this is a contract for the sale of goods,[1] Article 2 of the Uniform Commercial Code ("UCC") controls this matter, and due to this Court's jurisdiction under 28 U.S.C. § 1332, Pennsylvania substantive law interpreting the Code applies.

The UCC makes a distinction between cancellation and termination of an agreement for the sale of goods. Under the UCC, " '[t]ermination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract <u>otherwise than for its breach</u>. On 'termination' all obligations which are still executory on both sides are discharged . . . ." 13 Pa.Cons.Stat.Ann. § 2106(c) (2010) (emphasis added). In contrast, '[c]ancellation' occurs when either party puts an end to the contract <u>for breach by the other</u> and its effect is the same as that of 'termination' except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance." 13 Pa.Cons.Stat.Ann. § 2106(d) (2010) (emphasis added).

Therefore, the distinction is that "cancellation" reserves all remedies and applies when a party ends a contract due to the other party's breach, while "termination" only provides a remedy for a prior breach and applies when the contract ends either by agreement or law – not by breach. See *id*.

Turning to the instant matter, at the outset the Court notes that the contract at issue is between merchants, and ones who have had extensive history with one another buying and

---

[1] Based on the tables set forth in the 2009 Supply Agreement (the only agreement at issue here), it is clear to this Court, and the parties do not dispute, that goods at issue hold a value well in excess of $500.00.

selling GOES.[2]  The Comment to 13 Pa.Cons.Stat.Ann. §2104 notes, "[t]his Article assumes that transactions between professionals in a given field require special and clear rules which may not apply to a casual or inexperienced seller or buyer."  See *Uniform Commercial Code Comment* to 13 Pa.Cons.Stat.Ann. § 2104 (2010).  In this case, because both parties are "merchants" and the contract is one "between merchants," the special and clear rules of the UCC <u>will</u> apply.

As both parties emphasized in their respective briefs, the "paramount goal of contract interpretation is to determine the intent of the parties," (see *American Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 587 (3d Cir. 2009)); however, this Court also considers that the parties will simultaneously be held, as merchants, to know and understand the "special and clear rules" for the sale of goods under the UCC. Simply put, when considering the intent of the parties in this case, this Court has taken into account that they are "merchants" under the UCC and that the contract they executed was "between merchants," and thus, will apply all of the "rules" under the UCC.

With this in mind, the Court begins its analysis with Paragraph 2 of the 2009 Supply Agreement which provides that the Agreement "shall be effective with shipments beginning January 1, 2009 and terminate with shipments on December 31, 2012."  Based on this statement this Court finds that there is a contract for a definite period of time.

Next, Paragraph 3 of the 2009 Supply Agreement details the quantity of GOES that defendant agreed to supply and plaintiff agreed to buy each year: 2009, 2010, 2011, and 2012.  Paragraph 3 also indicates that the "2009 through 2012 annual volumes [quantities] . . . are take-

---

[2] "Merchant" is defined as someone who: (1) deals in goods of the kind; or (2) otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.  13 Pa.Cons.Stat.Ann.. §2104 (2010).  "Between merchants" means in any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants.  *Id.*

or-pay, unless otherwise agreed to by the parties in writing." Based on these portions of Paragraph 3, this Court finds that the quantity requirements are met and that the parties agreed to a "take-or-pay" provision with respect to those quantities.

Finally, Paragraph 7 of the 2009 Supply Agreement (just like Paragraph 7 of the 2006 Supply Agreement) states in pertinent part:

> 7.  Terms and Conditions – ALC [defendant] sales will continue to be subject to the Standard Terms and Conditions set forth on the reverse side of our Sales Order Acknowledgements, except that ALC and HI [plaintiff] specifically agree that:
>
> - No changes of any kind or type may be made to this Agreement except in writing and signed by ALC and HI.

The 2009 Supply Agreement is silent on the topic of cancellation, which, as noted above, differs from termination under the UCC. Although the Supply Agreement is silent with respect to cancellation, as plaintiff notes, the Terms and Conditions in made a provision for it.[3]

Paragraph 11(b) of the Terms and Conditions provides:

> This Agreement is noncancellable by Buyer [plaintiff] for all goods and/or services for which the estimated dates for shipping and/or rendering services shown on the face hereof are within two (2) years from the date of acceptance of this Agreement by Buyer provided, however, that goods and/or services estimated to be shipped or performed from and after two (2) years from the date hereof may be cancelled without cancellation or other penalty in whole or in part by Buyer upon one (1) years prior written notice to Seller [defendant] with respect to the specified goods and/or services covered by this Agreement which are to be so cancelled.

See doc. nos. 54, ¶ 71 and 47-17, Exhibit R (filed under seal).

---

[3] It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties. *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 107 (3d Cir. 1986) (citations omitted). It is also a general rule of law that where one contract refers to and incorporates the provisions of another, both shall be construed together. *Chicago Pneumatic Tool Co. v. Ziegler,* 151 F.2d 784, 795 (3d Cir. 1945). Accordingly, this Court has examined the Supply Agreement and the Terms and Conditions and finds that together they comprise the complete contract at issue here and, thus, shall construe them together.

The 2009 Supply Agreement, dated March 11, 2008,[4] was an agreement for the supply of GOES beginning on January 1, 2009, and continuing through December 31, 2012. Doc. no. 47-8, Exhibit I (filed under seal). The 2009 Supply Agreement incorporated the Terms and Conditions, including Paragraph 11(b), above.

Applying the Code to these merchant-parties, Paragraph 11(b) limited plaintiff's ability to put "an end to the contract (*i.e.* the 2009 Supply Agreement) for breach" by defendant. See 13 Pa.Cons.Stat.Ann. § 2106(d) (2010). Based upon the parties' relevant, material and undisputed facts, at no time did defendant breach the contract; and thus, the cancellation clause found in Paragraph 11(b) of the Terms and Conditions is wholly inapplicable to the resolution of the matter presently before the Court.

Plaintiff's reference to Paragraph 11(b) and its use of the term "cancel" throughout its communications when it attempted to convince defendant to end the 2009 Supply Agreement early (see doc. nos. 47-16 and 47-18, both filed under seal), does not alter the fact that plaintiff, as a merchant, is bound by the Code's definition of "cancellation." Because there was no breach on the part of defendant, plaintiff does not have a right to "cancel" the 2009 Supply Agreement as that term is defined.

Even if this court were to consider the colloquial use of the terms "cancel" and "cancellation" (which this Court has already determined it cannot due in light of the status of the parties as merchants), and thereby interpret them to mean "terminate" and "termination," the parties' relevant, material and undisputed facts note that the 2009 Supply Agreement states: (1) the contract would not terminate until December 31, 2012; and (2) no changes of any kind or type may be made to this Agreement except in writing and signed by the parties. Doc. no. 54 at ¶ 27. See also doc. no. 47-5, Exhibit F (filed under seal). Therefore, absent a written document

---

[4] The 2009 Supply Agreement was executed by defendant on March 18, 2008 and by plaintiff on March 20, 2008.

signed by both parties agreeing to a different termination date, the contract terminates on December 31, 2012.

In sum, as of March 2008, the parties manifested their intent to buy and sell set quantities of GOES until December 31, 2012. Unless the parties both agree (in writing) to terminate their obligations to one another as of a different date, the date set forth 2009 Supply Agreement (December 31, 2012) remains the termination date. However, plaintiff, as the buyer could cancel the 2009 Supply Agreement under certain parameters (set forth above as quoted from Paragraph 11(b)), if defendant breached. Because plaintiff does not contend that defendant breached the 2009 Supply Agreement – and the Court finds no evidence of a breach on defendant's part – the cancellation provision found in paragraph 11(b) of Terms and Conditions does not apply. Because there is no dispute of material fact leading to this conclusion, the Court will enter summary judgment in favor of defendant by granting defendant's motion (doc no. 34) and denying plaintiff's motion (doc. no. 41). An appropriate Order follows.

                                                s/ Arthur J. Schwab
                                                Arthur J. Schwab
                                                United States District Judge

cc:       All Registered ECF Counsel and Parties